J-S29032-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: N.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: I.B., MOTHER | : | |
| | : | No. 453 WDA 2024 |

Appeal from the Order Entered April 1, 2024
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000136-2023

BEFORE: DUBOW, J., KING, J., and BENDER, P.J.E.

MEMORANDUM BY BENDER, P.J.E.: **FILED: September 17, 2024**

I.B. ("Mother") appeals from the order dated March 13, 2024, and entered on April 1, 2024, in the Court of Common Pleas of Allegheny County Orphans' Court, which granted the petition of Allegheny County Office of Children, Youth and Families ("CYF") for termination of Mother's parental rights to her minor daughter, N.B. ("the Child"), pursuant to sections 2511(a)(2), (8), and (b) of the Adoption Act, 23 Pa.C.S. §§ 2101-2938.[1] We affirm.

_____

[1] The parental rights of J.P. ("Father") and any "Unknown Father" were also terminated by order of court on the same date; however, neither Father nor Unknown Father has filed an appeal. **See** Orphans' Court Opinion ("OCO"), 5/8/24, at 1 n.1 ("Mother named J.P. as the Child's father."); **id.** at 2 (indicating that Father "acknowledged being the father, but paternity was never established").

The orphans' court set forth the following findings of fact in its Pa.R.A.P.
1925(a) opinion:

The Child is a little girl born to Mother [i]n October [of] 2016. …
Neither [Father] nor any other man has had any involvement in
the Child's life.

There were two CYF caseworkers[:] [Jesi Williams,] who worked
on the case from the adjudicatory hearing until it moved to
permanency in August 2023 … [;] and [Cassie McIlwain,] who took
over from that point on…. [Ms. Williams] explained that on March
11, 2022, the Child's case was referred to CYF after Mother left
the 5-year-old girl home alone. Police came and took custody of
the Child, and CYF obtained an emergency custody authorization
that same evening. It took four days for CYF to get Mother to
contact them after Mother left the Child alone.

The Child was then placed in her first of two foster homes. The
Child was never returned to Mother. On April 18, 2022, the Child
was adjudicated dependent.

Mother's goals were reflected in the order that she attend
intensive outpatient treatment, provide clean drug screens,
provide slips of attendance at Narcotics Anonymous ("NA"),
resolve her criminal matters because she was charged with
endangering the welfare of a child, turn over the Child's inhaler
(because the Child has asthma), engage in supervised visits with
the Child, undergo a mental health evaluation, remain in contact
with CYF, complete counseling for intimate partner violence
("IPV")[,] and attend parenting programming. The IPV counseling
was ordered after Mother reported feeling unsafe and after she
filed several requests for protection from abuse orders, some
while the Child was in her care. CYF began family planning
meetings to assist Mother in moving toward reunification, but
Mother only attended one session by phone and hung up after 10
minutes when she became agitated.

By the time of the hearing on her parental rights, Mother's criminal
charges were still pending. Mother did turn over the Child's
inhaler, but the inhaler was expired.

Based on the evidence, the fundamental problem in this case was
that Mother would make half-hearted attempts to comply with her
goals, generally with hearings approaching, and then quickly

- 2 -

abandon those efforts. Most significantly, Mother seemed to make initial attempts at compliance in 2022[,] after the Child was removed[,] and then some other partial attempts in mid-2023 with a November 2023 permanency review hearing on the horizon. However, Mother ceased meaningful compliance each time.

Mother's greatest barrier to reunification was her inability to maintain sobriety and her inability to visit her Child consistently, two persistent problems that operated synergistically to the Child's detriment. CYF filed the petition to terminate Mother's rights on June 14, 2023[,] because Mother had not successfully completed any of her court-ordered goals. Consequently, many of Mother's gestures toward compliance with goals and court orders occurred too late.

At the time of the hearing, the Child was 7 years old and thus had been in care for just over two years.

OCO at 2-3 (cleaned up).

A termination hearing was held on March 13, 2024, at which multiple witnesses were called by CYF. Mother was present at the hearing and was represented by counsel, but she did not testify on her own behalf. On the same date, the orphans' court issued an order, which was entered on April 1, 2024, terminating Mother's parental rights to the Child, pursuant to 23 Pa.C.S. §§ 2511(a)(2), (8), and (b). Mother filed a timely notice of appeal, along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i). She now presents the following issues for our review:

1. Did the [orphans'] court abuse its discretion and/or err as a matter of law in granting the petition to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S. §[]2511(a)(2)?

2. Did the [orphans'] court abuse its discretion and/or err as a matter of law in granting the petition to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S. §[]2511(a)(8)?

3. Did the [orphans'] court abuse its discretion and/or err as a matter of law in concluding that CYF met its burden of proving by clear and convincing evidence that termination of Mother's parental rights would best serve the needs and welfare of the [C]hild pursuant to 23 Pa.C.S. §[]2511(b)?

Mother's Brief at 6.

We review an order terminating parental rights in accordance with the following standard:

When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009) (quoting *In re S.H.*, 879 A.2d 802, 805 (Pa. Super. 2005)). Moreover, we have explained that:

The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

*Id.* (quoting *In re J.L.C. & J.R.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003)).

The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence. *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004). If competent evidence supports the trial court's findings, we will affirm even if

the record could also support the opposite result. ***In re Adoption of T.B.B.***,

835 A.2d 387, 394 (Pa. Super. 2003).

We are guided further by the following: Termination of parental rights

is governed by section 2511 of the Adoption Act, which requires a bifurcated

analysis.

> Our case law has made clear that under [s]ection 2511, the court
> must engage in a bifurcated process prior to terminating parental
> rights. Initially, the focus is on the conduct of the parent. The
> party seeking termination must prove by clear and convincing
> evidence that the parent's conduct satisfies the statutory grounds
> for termination delineated in [s]ection 2511(a). Only if the court
> determines that the parent's conduct warrants termination of his
> or her parental rights does the court engage in the second part of
> the analysis pursuant to [s]ection 2511(b): determination of the
> needs and welfare of the child under the standard of best interests
> of the child. One major aspect of the needs and welfare analysis
> concerns the nature and status of the emotional bond between
> parent and child, with close attention paid to the effect on the child
> of permanently severing any such bond.

***In re L.M.***, 923 A.2d 505, 511 (Pa. Super. 2007) (citing 23 Pa.C.S. § 2511,

other citations omitted). The burden is upon the petitioner to prove by clear

and convincing evidence that the asserted grounds for seeking the termination

of parental rights are valid. ***R.N.J.***, 985 A.2d at 276.

With regard to section 2511(b), we direct our analysis to the facts

relating to that section. This Court has explained that:

> Subsection 2511(b) focuses on whether termination of parental
> rights would best serve the developmental, physical, and
> emotional needs and welfare of the child. In ***In re C.M.S.***, 884
> A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles
> such as love, comfort, security, and stability are involved in the
> inquiry into the needs and welfare of the child." In addition, we
> instructed that the trial court must also discern the nature and

status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. *Id.* However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008). Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. *Id.* at 763.

*In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010).

Instantly, the orphans' court terminated Mother's parental rights pursuant to sections 2511(a)(2), (8), and (b). We need only agree with the orphans' court as to any one subsection of section 2511(a), as well as section 2511(b), in order to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Herein, we analyze the court's decision to terminate under section 2511(a)(2) and (b), which provide as follows:

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

…

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

…

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any

efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2), (b).

We first address whether the orphans' court abused its discretion by terminating Mother's parental rights pursuant to section 2511(a)(2).

> In order to terminate parental rights pursuant to 23 Pa.C.S. [] § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical and mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

Instantly, Mother argues that CYF failed to prove she has not or cannot remedy the conditions that caused the Child to be without essential parental care. Mother's Brief at 15 (citing 23 Pa.C.S. § 2511(a)(2)). In support of her argument, Mother merely states:

> The condition that led to the Child's removal was the allegation that Mother left the Child alone on March 11, 2022. Mother tested clean from drugs on March 31, 2022. Despite a history of Mother attending drug treatment inconsistently, the record lacked evidence that drug use prevented Mother from caring for the Child. The criminal case against Mother resulting from this

allegation has yet to be tried. Other than the pending criminal case, CYF failed to prove Mother's inability to care for the Child.

*Id.* at 15-16 (citation to record omitted). Mother has failed to convince us that she is owed any relief on this claim.

According to Ms. Williams, the first caseworker assigned to this case, Mother began drug and alcohol treatment at multiple facilities in 2022 and 2023, but "did not remain sober." OCO at 3 (citing N.T., 3/13/24, at 18-20, 47-50). Ms. McIlwain, the second caseworker, testified that Mother had completed her IPV counseling and parenting programming in 2023, but that she had not met her drug and alcohol recovery goal. *Id.* at 3-4 (citing N.T. at 79-82, 84). *See also* N.T. at 81 (noting that Mother's attendance at the drug and alcohol programming was "sporadic and inconsistent"); OCO at 7 (emphasizing that, while Mother completed the parenting programming, "[g]etting Mother into a parenting program was a struggle").

Rachel Wagner, the program director at PA Organization for Women in Early Recovery ("POWER"), gave corroborating testimony. OCO at 4. She stated:

> CYF referred Mother [to POWER] for a[ drug and alcohol] assessment … on March 18, 2022, and Mother completed the assessment on March 31, 2022[,] with a diagnosis of "cocaine use mild in early remission." POWER recommended intensive outpatient services, and Mother agreed. Mother told POWER that she was in treatment at Gateway Rehab but did not provide verification. POWER asked for 30-, 60-, and 90-day assessments, and Mother responded to two of those requests. At some point thereafter, Mother stopped treatment. Mother then referred herself back to POWER on August 22, 2022, then missed two appointments, and her case was closed the next month. POWER's documentation revealed that Mother was not in treatment at that

time. The following year, Mother again referred herself to POWER on May 19, 2023. Although Mother could have attended POWER assessments at the POWER office or a community location, depending on her preference, Mother again missed two appointments, resulting in her third case closure.

*Id.* (citations to record and paragraph breaks omitted).

The record indicates that "Mother's participation in urine screening was equally poor." *Id.* Tarraca Jackson, the supervisor for the Allegheny County Health Department who oversees its downtown and McKeesport locations, testified that, as of the termination hearing date, Mother had been called in for 33 screens, but that she only completed two — one in January 2024 and the other in February 2024. *Id.* (citing N.T. at 18-19). She tested positive for cocaine each time, "despite the approaching hearing on her parental rights." *Id.* (citing N.T. at 19).

As for Mother's visitation goal, the record supports the orphans' court conclusion that Mother failed to meet this goal, "much to the Child's emotional harm." *Id.* at 5. As the orphans' court noted:

Mother was given a supervised visit[ation] schedule of once per week in person at a regional office and once per week virtually[,] although in late September of 2023, visits were reduced to every other week in person. To accommodate Mother, the visits were moved repeatedly, and CYF gave Mother bus passes and tickets. The Child's foster care agency provided visit supervisors[,] although [Ms. Williams] … supervise[d] two visits. One of those two went well, but at the other, in June of 2023, Mother appeared to be under the influence of a substance. Mother later stated that she did not even remember the visit. At this particular visit, Mother exhibited erratic eye movements, shook her leg continuously, and spoke in a rushed and pressured manner.

[Amber Sturdivant, t]he Child's foster care worker and regular visitation supervisor from Wesley Family Services[,] testified

similarly. On a couple of visits, [Ms. Sturdivant] observed how Mother behaved oddly, bouncing her leg while standing and appearing unable to sit still to the point where the Child asked her if her Mother was all right. At one such visit, [Ms. Sturdivant] said,

> for the full two hours[,] Mother could not stay still. She was on the floor. She was back upon the couch. She was back on the floor. She was on the other side of the room. Her legs were shaking. A lot of rocking back and forth. And her hunger seemed insatiable.

[N.T. at 119].

It was [Ms. Sturdivant's] job … to visit the foster home, supervise visitation, and make sure the Child's needs were met. She provided an overall picture of Mother's visitation…. Over the course of the two years in which the Child was in [foster] care, Mother attended fewer than half of the visits made available to her; specifically, Mother cancelled or failed to confirm 95 of them. Mother attended 41 and would sometimes show up late or leave early. Mother sometimes blamed the curtailed visits on the bus schedule, but on the other hand, she also left early and arrived late for virtual visits, not giving any reason.

Mother's general difficulty maintaining contact with CYF and other providers permeated the case, including where [contact was] needed to visit her Child. However, Mother would manage to reach out about bus passes and tickets, which Mother would then repeatedly claim she had lost. In fact, Mother sought four replacement bus passes during the short time [Ms. McIlwain] was working on [this case].

The Child's increasing pain upon Mother's failure to appear was described by [Ms. Williams,] who was present in the office for a scheduled visit a couple of months before the [termination] hearing…. She saw the Child waiting on her Mother to appear. Her Mother had confirmed in advance, but as time passed without Mother showing up, the Child became sad. As the Child left for the car to return to her foster home, she asked if her Mother could be in that car. She then began looking at the other parked cars to see if her Mother was in any of them.

[Ms. Sturdivant] described the same scene, saying that Mother's failure to appear was hurtful to the Child and, at one visit, Mother's no-show "broke" the Child. *Id.* at 123. The Child did not want to

leave the facility, and when she was finally persuaded to do so, she was checking every car for Mother. On the way back to her foster home, the Child asked why her Mother did not want to see her, and she held her head down to the point that her "head was literally dragging." *Id.* at 124, 135. [Ms. Sturdivant] emphasized that the Child's reaction was more intense than usual and that she had "never seen the Child refuse to leave the visitation center. Ever." *Id.* at 134.

*Id.* at 5-6 (some citations to record omitted).

Additionally, the record reflects that Mother was ordered to undergo mental health evaluations because of her "self-report[ing] of symptoms of depression and her suffering from anxiety, post-traumatic stress disorder[,] and bipolar disorder, all of which were untreated." *Id.* at 7 (citing N.T. at 44-45, 62). CYF reported that it gave Mother referrals to mental health centers and bus tickets to help her attend, but that it was never able to substantiate Mother's sustained engagement in mental health treatment. *Id.* (citing N.T. at 46, 73). The orphans' court found this "quite significant[,] because when Mother did submit to an evaluation for the hearing, Mother exhibited numerous mental health problems that impacted her parenting and functioning." *Id.*

Dr. Beth Bliss, a licensed psychologist and acknowledged expert in psychology and child psychology, provided the following "illuminating testimony" regarding her evaluations of Mother, Child, and the Child's current foster parents:

Dr. Bliss evaluated Mother on February 20, 2024. Mother had been scheduled for an evaluation twice in November but canceled with minimal notice. Pertinently, Dr. Bliss evaluated Mother both for mental health and drug and alcohol abuse or recovery.

Dr. Bliss observed that Mother had started and stopped numerous drug and alcohol programs[,] and that Mother cited scheduling concerns as to why she had stopped attending her most recent program. Specifically, Mother told Dr. Bliss that Mother had quit because she "started job stuff instead." [N.T.] at 148…. Mother blamed the various treatment facilities for her failure to complete the programs, saying, for example, that one of the rehabilitation facilities had lost her medications. Mother did report completing a rehabilitation program at Gateway in January of 2023[,] followed by an effort at outpatient treatment at an unnamed facility that Mother alleged was next to a bar. Mother claimed that she left that program because [she] found it inappropriate that there would be a drug and alcohol program at such a location.

Dr. Bliss assessed Mother's mental health, and the evaluation offered insight into Mother's start-stop conduct toward her major goals. Dr. Bliss diagnosed Mother with paranoid personality disorder with borderline traits and with stimulant use disorder moderate, cocaine. Mother did describe historically feeling depression and anxiety but not sufficiently to rise to the level of a clinical diagnosis[,] although the diagnosis Dr. Bliss did list includes some of those symptoms. Mother's psychological testing demonstrated that Mother "was moderately or clinically significantly impaired[,] indicating some higher than normal difficulty in both personality and emotional or behavioral functioning." *Id.* at 153. Dr. Bliss explained that when putting the entire picture together[,] it presented "someone who has a lot of distrust in others. A lot of difficulty with interpersonal relationships because of that distrust. And also has significant concerns in many different areas of their life." *Id.* at 154. People with Mother's characteristics "prefer to be in control of situations or people. They tend to be impulsive risk takers. They may have a history of illicit drug use or legal involvement." *Id.* Moreover, Mother's mental health issues can "lead to difficulty in receiving appropriate services or working with providers because of those interpersonal difficulties and difficulties trusting others." *Id.* …

Importantly, Mother's psychological problems placed the Child at risk. More specifically, the psychologist testified that because children pick up on their parents' attitudes and emotions, the Child would have an increased propensity to develop distrust and anxiety. Mother was impulsive and took risks with drug use that could and did endanger the Child and result in legal entanglements separating Mother from the Child. In Dr. Bliss's opinion, Mother did "not have insight as to why her daughter was taken into care[,]

nor why she remains in care." ***Id.*** at 156. Mother was able to describe using drugs while parenting[,] but [she] was "very distant or removed from any insight or thought as to what that may have meant for her Child." ***Id.*** Dr. Bliss concluded that Mother was in no position to reunify with her Child and was unlikely to get into such a position any time soon because Mother would need to demonstrate long-term sobriety that was "certainly not imminent." ***Id.*** at 156-57. Dr. Bliss described long-term sobriety as a period of three to six months of sobriety that might be followed by unsupervised visits and then six months to a year thereafter before reunification could occur.

***Id.*** at 8-9 (some citations to record omitted).

After considering the foregoing evidence, the orphans' court opined:

In the present case, Mother's performance was poor. She demonstrated a pattern of starting and then stopping key programs such as drug and alcohol treatment and visiting inconsistently with the Child. While Mother would initiate efforts, she almost invariably stopped. In the end, Mother's focus was more on obtaining multiple replacement bus passes than on seeing her Child or addressing her drug and mental problems. Mother was nowhere near sobriety by the time of the hearing on her rights. In fact, the credible testimony led this [c]ourt to conclude that she had at least on occasion visited the Child under the influence.

Mother did not make the required diligent efforts toward prompt reunification and assumption of parental duties, remaining ensconced in her mental health and substance abuse. She has not remedied conditions that led to the Child's removal and demonstrated no capacity to do so now or at any time in the foreseeable future. ***See, e.g.***, [***In re*** ]***N.A.M.***, 33 A.3d 95 [(Pa. Super. 2011)]. Accordingly, Mother's assertions under [s]ubsection (a)(2) are unavailing.

***Id.*** at 14-15. As the orphans' court's determination under section 2511(a)(2) is well-supported by the record, we discern no abuse of discretion.

As for the orphans' court's analysis under section 2511(b), Mother argues that the record fails to support the determination that termination of

her parental rights is in the best interest of the Child and would provide the Child with permanency. Mother's Brief at 17. Contrarily, she claims that she "has been the most permanent part of the Child's life…." *Id.* at 19. ***See also id.*** at 18-19 (Mother's noting that, at the time of the termination hearing, the Child had only been in her current foster home for approximately three months, after being placed with the first foster family for nearly 20 months). Moreover, she avers:

> The record clearly established that Mother and the Child share a very close and important bond. The Child loves Mother and derives invaluable and irreplaceable benefits of Mother's love, affection, and familial ancestry from [her] relationship with Mother. The Child deserves to have the benefits of [her] relationship with Mother preserved.

*Id.* at 19-20.

The orphans' court acknowledged that the Child was with her first foster family for a significant period but explained that she was then placed with her current foster family after concerns about the first family arose. OCO at 10. It considered the brevity of the Child's current placement, but determined that "the placement was by all measures going very well." *Id.* (citation omitted). The court added, "The length of time in which the Child has been with her current foster family did not concern Dr. Bliss, … who testified that there is no hard and fast guideline for such matters." *Id.* (N.T. at 170-71).

Additionally, the orphans' court considered the following testimony provided at the termination hearing:

> [Ms. McIlwain] testified that the Child had had visits, including overnight and extended visits, with the second foster family prior

- 14 -

to being placed in their home and that, in any case, CYF would retain custody and responsibility for the Child until adoption. [Ms. McIlwain] explained that[,] … with the passage of time, the Child's needs would be better met with adoption than reunification, particularly given the anguish that Mother's inconsistent visits were causing the Child.

[Ms. Sturdivant] testified that the Child appeared comfortable in [*sic*] her foster family and was adjusting and doing well overall. In fact, the Child has recently begun calling her foster mother her "mom." [N.T.] at 127. All members of the foster family appeared comfortable together, and the Child had adapted to their routine and was aware of expectations. The Child reported feeling safe and liking the family. [Ms. Sturdivant] had no concerns about the foster family's commitment and level of care. Additionally, [she] … testified that she had no concerns about Mother never seeing the Child again[,] even though the Child knows and loves her Mother[,] because the Child is in such a stable situation and is nurtured and safe there.

Dr. Bliss also assessed the Child's bond with Mother and saw that the Child was excited to see Mother. Mother and the Child talked and played together, but while the two were closely bonded, the Child … was deeply upset by Mother's missed visits. While the Child enjoyed seeing Mother when Mother showed up for visits, the Child told Dr. Bliss that if she could choose anyone to live with, she would choose her current foster home. Additionally, while the Child had a bond with Mother, the Child also had a strong and positive bond with her foster parents.

Dr. Bliss opined that termination of Mother's parental rights would serve the Child's needs and welfare. Her opinion was based on multiple factors, including the fact that the Child had been out of Mother's care for two years without Mother['s] making "any real progress towards obtaining and maintaining sobriety" or gaining "an understanding as to how substance use can impact her parenting." ***Id.*** at 159. As the caseworkers and visitation supervisor also testified, Dr. Bliss found that Mother's inability to visit the Child, despite the Child's bond, negatively affected the Child, who was showing distress and self-blame for Mother's failures. Thus, Dr. Bliss concluded, terminating that bond would also meet the Child's needs, and the foster parents would be able to mitigate and ameliorate any distress the Child might undergo from severing that bond.

*Id.* at 10-11 (most citations to record omitted). *See also id.* at 9 (noting Dr. Bliss's testimony that "the Child, who could have a predisposition to mental health or substance abuse, would benefit from the nurturing stability that her current foster family was providing").

> Based on the foregoing evidence, the orphans' court concluded:
>
> [T]ermination of Mother's rights would not destroy a necessary or beneficial relationship, crediting the testimony of the psychologist and accepting the credible testimony of the caseworker and visitation supervisor as to the Child's increasing distress as the Mother she cared for could not see fit to appear for visits knowing the Child was expecting her.
>
> This Child is in a foster family that does provide consistent love, structure, stability, caring, and safety. While the placement was several months old, it was preceded by visits, and Dr. Bliss testified that there is no hard and fast rule for how long a foster family must demonstrate worthiness. Dr. Bliss was confident in this Child's current care. CYF supplemented the testimony by emphasizing that it would retain custody and oversight through the adoption process. What would hurt the Child would be to leave her dangling between a path to permanence and Mother's infliction of pain on her from Mother's inability to overcome the obstacles to caring for this Child. This [c]ourt found credible the witnesses who testified that the foster family can help the Child through this transition. This Child has a chance to experience consistency, love, protection, and control and should not be cheated out of that opportunity.

*Id.* at 16-17. We are convinced that the orphans' court carefully considered the Child's best interest in reaching its decision. We discern no abuse of discretion as to section 2511(b).

Accordingly, we affirm the order terminating Mother's parental rights to the Child, pursuant to 23 Pa.C.S. §§ 2511(a)(2), (8), and (b).

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 09/17/2024